UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *ex rel.* ERICA SANDSTROM and | ) | |
| ADRIENNE ISLA, | ) | |
| | ) | |
| Plaintiffs and Relators, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 12 C 0622 |
| | ) | |
| BOARD OF EDUCATION OF THE CITY | ) | |
| OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

This matter comes before the Court on the motions of Defendants to dismiss the amended complaint of Plaintiffs Erica Sandstrom ("Sandstrom") and Adrienne Isla ("Isla") (collectively "Plaintiffs") pursuant to Federal Rules of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") and 9(b) ("Rule 9(b)").  For the reasons set forth below, the motions are granted in part and denied in part.[1]

---

[1] Defendants' motion to dismiss Count VI against the Board and Ayala  is entered and continued pending the five-page submissions of the parties in light of the recent Supreme Court case, *Young v. United Parcel Serv., Inc.*, 135 S.Ct. 1338 (2015).

## BACKGROUND

### I. Facts

For the purposes of the instant motion, the following well-pleaded allegations, derived from Plaintiffs' amended complaint, are accepted as true. The Court draws all reasonable inferences in favor of Plaintiffs. Defendants include the Chicago Board of Education (the "Board"), Dr. Asuncion Ayala, a/k/a Asuncion Estrada ("Ayala"), Mercedes Feliz-Matos ("Feliz-Matos"), Virgilio Santos ("Santos"), Denita Howze ("Howze"), Maryann Ramos ("Ramos"), Ida Roman, Leo Roman (collectively the "Romans"), Maria Mouroukos ("Mouroukos"), Nancy Troche ("Troche"), Yolanda Velez ("Velez"), Ignacio Lopez ("Lopez"), Martha Matos ("Matos"), Edwin Caraballo ("Caraballo"), Luz Borges-Caraballo ("Borges-Caraballo"), Carmen Cruz ("Cruz"), Carmen Martin ("Martin"), Rafael Boghosian, Shirlann Boghosian (collectively the "Boghosians"), Carmen Alequin ("Alequin"), Maria Vasquez ("Vasquez"), Digna Mercado ("Mercado"), Brenda Vera ("Vera"), Ana Arroyo ("Arroyo"), John Doe and Jane Doe (collectively "Defendants").

#### A. The Parties

North Grand High School ("NGHS") is a Chicago Public School ("CPS") located at 4338 West Wabansia Avenue in Chicago, Illinois. Sandstrom is a Caucasian female who worked as a guidance counselor at NGHS from January 2008 until her termination on August 31, 2010. Isla also worked as a guidance counselor at NGHS. The Board and CPS were Plaintiffs' employers. The Board is an entity

responsible for the governance, organizational and financial oversight of CPS and it establishes policies and standards to ensure accountability of the schools. Ayala was employed by the Board as the Principal of NGHS up until July 2011, serving as Plaintiffs' supervisor. Borges-Caraballo was employed by the Board as the Assistant Principal of NGHS. Caraballo, husband of Borges-Caraballo, was a former Board employee who had previously worked at NGHS. Feliz-Matos was employed by the Board as an employee of CPS. Santos was employed by the Board and worked as a math teacher at NGHS. Alequin was employed by the Board as a special education classroom assistant at NGHS. Martin was employed by the Board and worked as a guidance counselor at NGHS. Vasquez was employed by the Board and worked at Lowell Elementary School. Lopez was employed by the Board, assigned to work at NGHS. Ramos, Troche, Matos, Mouroukos, John Doe and Jane Doe were employed by the Board and worked at NGHS. Arroyo, Vera, Mercado, Howze, Ida Roman, Leo Roman, and Cruz were also employed by the Board. Velez was a Cook County Sheriff's Office employee. Rafael Boghosian and Shirlann Boghosian were both retired Board employees.

**B. Allegations of Fraudulent Misconduct**

Plaintiffs allege that as of 2008, 2009 and 2010, Ayala oversaw multiple schemes at NGHS, including: (i) free and reduced-price lunch fraud; (ii) tuition fraud; (iii) fraudulent use of government facilities; (iv) fraudulent invoicing; and (v) payroll fraud. A majority of Defendants were allegedly involved with the main scheme

involving free lunches, and the Court expounds on the details of the lunch fraud below.  As for the remaining four fraudulent schemes, the Court provides individualized illustrations of each in the Discussion Section of this opinion.

The alleged lunch scheme began when Ayala and her administrative staff encouraged parents of NGHS students to intentionally misrepresent their household income, number of children in their household, and other information on forms submitted to the federal government (the "School Lunch Forms").   Parents submitted the School Lunch Forms so their children could qualify for free or reduced-price lunches under the federal Child Nutrition Act of 1966 and the National School Lunch Act (collectively the "School Lunch Acts").

Furthermore, pursuant to Illinois law and the Board's policies, a CPS school may be eligible to receive Supplemental General State Aid ("SGSA") from the State of Illinois based on the information submitted in the School Lunch Forms.  SGSA is part of the General State Aid, which the Board and/or CPS receives from the State of Illinois.  Required by law, General State Aid is to be distributed directly to qualifying schools.  SGSA funds are discretionary and the principal of a qualifying school controls how these funds are spent.  The amount of SGSA funds distributed is based upon the concentration level of children from low-income households.  Funds are distributed to the schools in proportion to the number of pupils enrolled who are eligible to receive free or reduced-price meals under the School Lunch Acts during the immediately preceding year.  The poverty data is taken at one point in time for the

entire school system (end of September). The Board and/or CPS established a flat rate per-pupil amount for 2007, 2008, 2009, 2010, 2011 and 2012, and calculated the SGSA allocation based on the number of eligible students for each qualifying school. The Board then allegedly used the above methodology when it distributed discretionary SGSA funds directly to CPS schools through their principals.

From 2007 to 2012, NGHS was allocated more than $700.00 in SGSA funds for each NGHS pupil who was deemed eligible to receive free or reduced-price meals under the School Lunch Acts. Once the SGSA funds were allocated from the State of Illinois to NGHS, it was within Ayala's discretion to determine how these SGSA funds would be spent.

To increase the amount of her discretionary budget, Plaintiffs allege Ayala told her administrative staff and parents of students at NGHS to fill out free or reduced-price School Lunch Forms. If the child was not eligible, Ayala allegedly instructed her administrative staff and parents to intentionally misrepresent the parents' household income, number of dependents in the household, and other information on the School Lunch Forms such that it would appear as though the child was eligible for free or reduced-price school lunches. Ayala then allegedly signed off on the School Lunch Forms and submitted them, knowing the forms contained incorrect information. Consequently, Plaintiffs allege that Ayala's actions caused the parents and her administrative staff to intentionally misrepresent information on the School Lunch Forms submitted to the federal government so the federal government would

provide funding to pay for each allegedly wrongfully enrolled student's lunch for that year. Ayala's actions also allegedly caused the parents and her administrative staff to intentionally misrepresent information on the School Lunch Forms so the State of Illinois would provide Ayala with additional discretionary SGSA funding.

### C. Discovery of Alleged Schemes

Beginning in 2009, Plaintiffs allegedly discovered that NGHS employees were submitting false School Lunch Forms. At this time, Plaintiffs allege they also learned of certain teachers and employees at NGHS who lived outside the City of Chicago and were falsifying documents to avoid paying non-resident tuition for their children who attended NGHS.

After discovering the alleged fraudulent schemes, Plaintiffs attempted to complain about the activity at NGHS to Ayala. Ayala supposedly refused to meet with Plaintiffs and directed her administrative staff and her Assistant Principal, Borges-Caraballo, to harass and intimidate Plaintiffs in order to prevent them from raising any more complaints. In December 2009, Plaintiffs reported ongoing fraudulent activity at NGHS regarding the school lunch issue to the Board's law department. The Board's law department allegedly failed to address Plaintiffs' concerns, including their claims involving Ayala's retaliation, described below. As a result, Plaintiffs and other employees at NGHS began meeting to discuss the alleged false and fraudulent activity at NGHS in order to determine what lawful actions they could take against Defendants.

## D. Retaliation

The group attempted to keep their meetings confidential because they were allegedly fearful of retaliation by Ayala. Moreover, the group discussed the escalating racial animus by Ayala and other administrative staff against non-Hispanic employees at NGHS. Ayala is Hispanic and allegedly displayed a clear bias and preference for Hispanic teachers, staff and students. After Plaintiffs complained about the alleged fraudulent activity to the Office of the Inspector General of CPS, Ayala and her administrative staff allegedly threatened and intimidated Plaintiffs. Ayala changed Sandstrom's duties without notice and became overly critical of her performance as a guidance counselor.

With respect to Isla, Plaintiffs allege Ayala terminated (or refused to rehire) Isla for a part-time summer counselor position after Isla complained about the alleged ongoing fraudulent activity at NGHS. Ayala removed Isla from her position as Counseling Department Chairperson after Isla complained about false information submitted in the department. Ayala allegedly took adverse employment actions against Isla for complaining, but would not terminate her from her full time position because she was Hispanic. Ayala intimidated Isla and informed her she would be "the next to go" if Isla complained again.

In late March of 2010, Sandstrom took maternity leave. That summer, while Sandstrom was still on maternity leave, Ayala allegedly reassigned less qualified Hispanic employees to Sandstrom's position. Sandstrom also alleges that Ayala

intended to eliminate Sandstrom's position from the budget. Ultimately, Sandstrom's position was terminated in the summer, along with seven other employees, allegedly due to budgetary cuts. Only one of the seven terminated employees was Hispanic. That Hispanic employee was allegedly immediately rehired by Ayala into another position. Sandstrom alleges Ayala terminated her in retaliation for reporting false and fraudulent activities by employees and administrators at NGHS, because she was white, and as a result of her taking leave for her high-risk pregnancy.

At all relevant times, the Board allegedly had "invariable custom and usage of vesting decisional authority in principals," like Ayala, to make renewal and classification decisions as to guidance counselors. The Board supposedly had a policy and practice by which it delegated and entirely deferred to Ayala for all employment and personnel decisions at NGHS, including hiring, reassignments and terminations. Ayala was allegedly the final-decision maker as to employment and staffing matters at NGHS.

### E. Public Disclosure of Alleged Fraudulent Activity

On April 1, 2010, Plaintiffs and others submitted a report to the Inspector General of CPS, complaining of more than a dozen instances of false and fraudulent conduct ("Plaintiffs' Report"). Plaintiffs attach Plaintiffs' Report to their amended complaint. Between April 1, 2010 and October 1, 2010, Plaintiffs allegedly submitted documents, including Plaintiffs' Report, to federal and state departments and agencies, including the Federal Bureau of Investigation ("FBI"), the Illinois

Attorney General and other governmental agencies. Plaintiffs claim they were the original sources of the information submitted to these governmental departments and agencies.

The Illinois Attorney General chose not to investigate or prosecute the reported fraudulent activities. Federal authorities did not respond in writing to Plaintiffs' submissions. Eventually, the Inspector General for CPS released his own Annual Report for Fiscal Year 2011 (the "Inspector General Report") addressing the time period from July 1, 2010 through June 30, 2011, and confirming the substance of Plaintiffs' Report. The Inspector General Report is also attached to the amended complaint. Many Defendants voluntarily left, were terminated, or were designated as ineligible for rehiring based on the Inspector General Report.

When some authorities failed to act on Plaintiffs' submissions, Plaintiffs provided information regarding ongoing false and fraudulent conduct to Pam Zekman ("Zekman"), a reporter with CBS Channel 2 News in Chicago. On July 26, 2011, Zekman released an article entitled "CPS Moving To Fire Principal Over Fraud In Free Lunch Program." On January 2, 2012, Zekman released another article, "Report Details CPS Free Lunch Fraud, Improper Financial Benefits." On January 4, 2012, the Associated Press published an article entitled "CPS Overpaid Subs $1.13 Million, Says Chicago Inspector General." On January 5, 2012, the Chicago Tribune released an article called "New report chronicles misconduct within CPS" and that same day another article entitled "Inspector general unveils wide swath of offenses in new

report."   Additionally, on January 6, 2012, Plaintiffs provided pre-filing disclosures to the Office of the United States Attorney and to the Illinois Attorney General. Federal and state authorities have thus far declined to prosecute the complained of activities.

## II. Procedural History

On January 27, 2012, Plaintiffs filed their original complaint.  On March 27, 2012, the complaint was sealed.  On April 1, 2014, the seal was lifted and the United States and the State of Illinois declined to intervene with the *qui tam* claims.  On August 14, 2014, Plaintiffs filed an amended complaint against Defendants, alleging a *qui tam* action for violation of the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.* (Count I); a *qui tam* action for violation of the Illinois False Claims Act ("IFCA"), 740 ILCS *et seq*. (Count II); retaliation for complaining under the FCA (Count III); retaliation for reporting violations of the IFCA (Count IV);  violation of 42 U.S.C. § 1983 ("Section 1983") equal protection based on race and national origin (Count V); violation of Section 1983 under the Pregnancy Discrimination Act (the "PDA") (Count VI); violation of 42 U.S.C. § 1981 ("Section 1981") for reverse race and national origin discrimination (Count VII); violation of the Family and Medical Leave Act ("FMLA") for discrimination and retaliation (Count VIII); violation of the FMLA for interference (Count IX); violation of Section 1983 under the FMLA (Count X); violation of the Illinois Whistleblower's Act ("IWA"), 740 ILCS 174/1 *et seq*.

(Count XI); and for retaliatory discharge (Count XII).  The amended complaint has been served on all Defendants.

Plaintiffs allege Counts I and II against Ayala, Matos, Martin, Santos, Howze, Troche, Alequin, Mouroukos, Feliz-Matos, Arroyo, Ramos, Ida Roman, Leo Roman, Vera, Mercado, Velez, Vasquez, Borges-Caraballo, Caraballo, Cruz, Lopez, Rafeal Boghosian, Shirlann Boghosian, John Doe and Jane Doe.  Plaintiffs allege Count III against Ayala and the Board and Count IV, individually, against Ayala and the Board. Sandstrom alleges Counts V, VI, VII, VIII, IX, X against Ayala and the Board. Plaintiffs allege Counts XI and XII against the Board only.

Throughout September, some Defendants filed their motions to dismiss. Alequin, Arroyo, Mourokous, Troche, Velez, Vasquez, Vera, John Doe and Jane Doe are currently unrepresented by counsel, have failed to file a *pro se* appearance, and have not filed anything related to the pending motions to dismiss.

## LEGAL STANDARDS

### I. Rule 12(b)(6)

A motion to dismiss for failure to state a claim under Rule 12(b)(6) challenges the legal sufficiency of a complaint.  *Hallinan v. Fraternal Order of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide a short and plain statement of the claim showing that the plaintiff is entitled to relief.  Fed. R. Civ. P. 8(a)(2).  Essentially, the complaint must provide the defendant with "fair notice" of the claim and its basis.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Thus,

to survive a motion to dismiss, a complaint must contain sufficient factual allegations that, if accepted as true, state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II. Rule 9(b)

Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The False Claims Act "is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b)." *U.S. ex rel. Gross v. AIDS Research Alliance–Chicago*, 415 F.3d 601, 604 (7th Cir. 2005) (citation omitted). A complaint satisfies Rule 9(b) when it alleges "the who, what, when, where, and how: the first paragraph of a newspaper story." *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007).

While the circumstances constituting fraud must be pleaded with particularity, a defendant's "[m]alice, intent, knowledge [or] other condition of mind ... may be averred generally." Fed. R. Civ. P. 9(b). A plaintiff who provides a "general outline of the fraud scheme" sufficient to "reasonably notify the defendants of their purported role" in the fraud satisfies Rule 9(b). *Midwest Grinding Co. v. Spitz*, 976 F.2d. 1016, 1020 (7th Cir. 1992). When details of the fraud itself "are within the defendant's exclusive knowledge," specificity requirements are less stringent. *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994). Rule 9(b)'s heightened pleading

standard derives from "the potential stigmatic injury that comes with alleging fraud" and the desire to discourage a "sue first, ask questions later" approach to fraud litigation. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011).

**DISCUSSION**

## I. "Shotgun Pleading"

The Court must first address the instances of "shotgun pleading" in Plaintiffs' amended complaint. By "shotgun pleading," we mean that the statement in the first paragraph of some of the counts incorporates prior, unrelated, paragraphs as reference—essentially abusing Federal Rule of Civil Procedure 10(b). *See* Fed. R. Civ. P. 10(b) (allowing a party to refer by number to a paragraph in an earlier pleading). "Courts have discouraged this type of 'shotgun' pleading where each count incorporates by reference all preceding paragraphs and counts of the complaint notwithstanding that many of the facts alleged are not material to the claim, or cause of action, appearing in a count's heading. Such pleadings make it virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *CustomGuide v. CareerBuilder, LLC*, 813 F.Supp 2d 990, 1001 (N.D. Ill. 2011) (citation, brackets, and internal quotation marks omitted).

Defendants failed to notify the Court of Plaintiffs' utilization of the shotgun pleading technique, but we find there is "enough clarity to determine what [Plaintiffs] seek[] to hold" and thus, we "will decide the motion[s] to dismiss on the basis of

whether [Plaintiffs] ha[ve] adequately stated valid claims, rather than requiring [them] to replead [their] claims yet again." *See Chriswell v. Vill. of Oak Lawn*, No. 11 C 00547, 2013 WL 5903417, at *5 (N.D. Ill. Nov. 4, 2013) *aff'd sub nom. Chriswell v. O'Brien*, 570 F. App'x 617 (7th Cir. 2014).

## II. False Claims (Counts I and II)

Pursuant to Rule 12(b)(6) and Rule 9(b), Defendants Ayala, Matos, Martin, Santos, Howze, Feliz-Matos, Ramos, Ida Roman, Leo Roman, Mercado, Borges-Caraballo, Caraballo, Cruz, Lopez, Rafeal Boghosian, and Shirlann Boghosian move to dismiss Count I (false claims under the FCA) and Count II (false claims under the IFCA) against them. Defendants' arguments for dismissal of Counts I and II are identical. Since the IFCA is modeled after the FCA, the reasoning below applies equally for both. *See, e.g., People ex rel. Levenstein v. Salafsky*, 789 N.E.2d 844, 850-51 (Ill. App. Ct. 2003).

### A. FCA Procedural Requirement Under Section 3730(b)(2)

Generally, Plaintiffs must comply with specific requirements when filing a complaint, including serving the government with the complaint while it remains sealed until the government determines whether it wants to intervene:

> A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

31 U.S.C. § 3730(b)(2) ("Section 3730(b)(2)").  Plaintiffs met these requirements for their original complaint, but did not serve a copy of their amended complaint on the government.  For those Defendants that argue there were no references to their involvement with the alleged lunch scheme in the *original* complaint disclosed to the government, the claims against them in the *amended* complaint are not excluded because of Section 3730(b)(2).  *See U.S. ex rel. King v. F.E. Moran, Inc.*, No. 00 C 3877, 2002 WL 2003219, at *12-13 (N.D. Ill. 2002) (finding Section 3730(b)(2)'s requirements are procedural rather than jurisdictional, thus giving the court discretion to allow amendment under a Federal Rule of Civil Procedure 15 ("Rule 15") standard);  *see also U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 235 F.R.D. 661, 665-66 (N.D. Ill. 2006) (holding Section 3730(b)(2) procedural compliance non-mandatory in the context of disclosure statements when adding additional claims).  The Court permitted Plaintiffs' amendments of their FCA/IFCA claims under Rule 15.  Because Plaintiffs only broadened the scope of certain Defendants' fraudulent activity in their amended complaint, all of which was contained in the Inspector General Report attached to the original complaint given to the government, the Court will not require re-sealing the amended complaint and re-serving the government as outlined under Section 3730(b)(2).

**B. Public Disclosure Bar Under Section 3730(e)(4)**

*Qui tam* actions are subject to the public disclosure bar, 31 U.S.C. § 3730(e)(4). The 1986 version of Section 3730(e)(4)(A) deprives the court of jurisdiction over an action that is "based upon the public disclosure" of the allegations, unless the relator is the original source of the information upon which her lawsuit is based. 31 U.S.C. § 3730(e)(4)(A). With the 1986 version, courts found the "jurisdictional" nature of the public disclosure bar as "necessarily intertwined with the merits of the case," *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003) (en banc), *overruled on other grounds by Minn–Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012), and that although Section 3730(e)(4)(A) uses the term "jurisdiction," the United States Supreme Court has said it actually raises an issue of substantive law. *See Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939, 950-51 (1997) (stating that Section 3730(e)(4)(A) not only speaks to the power of the court, but to the substantive rights of the parties as well).

The 2010 version of Section 3730(e)(4)(A) disposed of the "jurisdictional" language and instead added language permitting the United States government to waive the public disclosure bar at its discretion. The 2010 version states "[t]he court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed . . . unless . . . the person bringing the actions is an original source of the information." 31 U.S.C. § 3730(e)(4)(A) (2010). Before

2010, the Seventh Circuit interpreted "based upon" to mean "substantially similar to the allegations already in the public domain." *See Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 910 (7th Cir. 2009). Thus, the 2010 amendment incorporated the Seventh Circuit standard. Plaintiffs' allegations need to be substantially similar to the public disclosure to establish the first step of the inquiry.

As for the definition of original source, the pre-2010 version states an original source: (i) has direct knowledge of the information on which her allegations are based; (ii) has "independent" knowledge of the information on which her allegations are based; and (iii) "has voluntarily provided the information to the Government before filing" a complaint based on her information. 31 U.S.C. § 3730(e)(4)(B). According to the post-2010 version of Section 3730(e)(4)(B), to qualify as an original source "means an individual who either (1) prior to a public disclosure under subsection (e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B) (2010).

Because the 2010 amendment is not retroactive, the applicable version of Section 3730(e)(4) is the one which was "in force when the events underlying th[e] suit took place." *Leveski v. ITT Educ. Servs.*, 719 F.3d 818, 828 (7th Cir. 2013) (internal quotations omitted). Accordingly, the 1986 version applies to Defendants'

allegedly fraudulent conduct, which occurred before March 23, 2010, and the 2010 version applies to fraudulent conduct that occurred thereafter. *See id.* Since some of Plaintiffs' allegations involve alleged misconduct after March 23, 2010, both versions must be satisfied.

Defendants argue Plaintiffs have failed to make a sufficient showing that they were the original source of the information against Defendants because Plaintiffs merely assert in a conclusory fashion that they are the original sources. Plaintiffs provide the newspaper articles discussing the alleged lunch fraud, which were released beginning in July 2011. In her reply brief, Feliz-Matos attaches another article from July 7, 2010, entitled "2 Investigators, BGA Uncover CPS Free Lunch Fraud." All of these articles report generally about the alleged lunch fraud by various NGHS personnel. Plaintiffs do not contest these public disclosures, but instead focus on the fact that they were the original sources of the information in the articles.

Based on the non-conclusory allegations in the amended complaint, it is presently clear to the Court that Plaintiffs have sufficiently alleged direct and independent knowledge on which the allegations in this case are based. Plaintiffs worked at NGHS. While helping students apply for college financial aid in late 2009, Plaintiffs learned Santos, Howze and Velez submitted fraudulent School Lunch Forms by underreporting their household income on each of the School Lunch Forms for their children enrolled at NGHS. Plaintiffs provide the years these employees submitted the School Lunch Forms. Before reporting to the Inspector General, but

after the original lunch form fraud complaints, Plaintiffs discovered Mouroukos, Feliz-Matos, Ramos, Vera and Vasquez also submitted School Lunch Forms for their children by substantially misstating their household incomes. Plaintiffs allege Ayala engaged in the school lunch fraud by instructing others to intentionally misrepresent their household income on school lunch applications, delegating responsibility to Matos to help parents improperly fill out the forms, signing the School Lunch Forms, and submitting them to the government in 2008, 2009 and 2010. Together, these allegations establish that Plaintiffs have the necessary direct and independent knowledge of the information on which the allegations here are based to support their claim that they are the original sources.

As for Ida Roman, Leo Roman, Troche, Martin, Mercado, Alequin, Arroyo and John Doe and Jane Doe, Plaintiffs were supposedly not aware of their involvement in the alleged fraudulent schemes until after Plaintiffs reported the violations of the FCA/IFCA to government officials. However, according to the definition of original source, it is not necessary for Plaintiffs to have direct and independent knowledge of each Defendant's involvement, just knowledge of information on which the allegations are based. Thus, at this time, we will not dismiss the Defendants who were not discovered until after the Inspector General Report emerged since the discovery of their involvement was a direct result of Plaintiffs' reporting the FCA/IFCA violations to government authorities. Because the other fraudulent schemes involving tuition, false invoices, payroll fraud and the fraudulent use of

governmental facilities were not publicly disclosed in the newspaper articles, the same holds true for those schemes embedded in Counts I and II. Simply because the Inspector General discovered additional fraudulent schemes at NGHS during its investigation does not prohibit Plaintiffs from now pleading them in this *qui tam* action. They stem from the overarching fraudulent activity Plaintiffs initially reported in the first instance and which are alleged in their amended complaint.

As for Section 3730(e)(4)(B)(2)'s requirement of voluntarily providing the information to the government before filing an action under this section, both versions of Section 3730(e)(4)(B) are satisfied because prior to the newspaper reports in July 2010, Plaintiffs allege they voluntarily disclosed the information to the government beginning April 1, 2010. Prior to commencing this lawsuit on January 27, 2012, Plaintiffs allegedly submitted copies of Plaintiffs' Report to the FBI, the Illinois Attorney General, and other governmental agencies between April 1, 2010 and October 1, 2010. The Court finds Plaintiffs' Report would have supplied the government with enough information to notify it of how Defendants were allegedly submitting false claims.

Established by the reasoning above, Plaintiffs have sufficiently pleaded they were the original sources of the publicly disclosed information. Plaintiffs, therefore, have met all the requisite terms of both versions of Section 3730(e)(4) to prevent the jurisdictional public disclosure bar from presently applying to this case.

## C. Rule 9(b) Heightened Pleading Standard

Since the Court has found that Plaintiffs are the original sources of the publicly disclosed information, we now must turn to whether Plaintiffs have satisfied the Rule 9(b) heightened pleading standard required for *qui tam* actions. A *qui tam* action is one in which private citizens sue for themselves, and on behalf of the government, to recover a penalty under a statute, which provides that part of the penalty is awarded to the party bringing the suit and the remainder of the penalty is awarded to the government. *See U.S. ex rel. Lusby v. Rolls–Royce Corp.*, 570 F.3d 849, 852 (7th Cir. 2009). The government remains the real party of interest in *qui tam* actions. *Id.* The FCA imposes liability against any person or entity that "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)-(2). To establish civil liability under the FCA, a relator generally must prove: (i) the defendant made a statement in order to receive money from the government; (ii) the statement was false; and (iii) the defendant knew the statement was false. 31 U.S.C. § 3729(a)(2); *U.S. ex rel. Hill v. City of Chicago*, No. 08 C 4540, 2014 WL 123833, at *6 (N.D. Ill. Jan. 14, 2014) *aff'd sub nom. U.S. ex rel. Hill v. City of Chicago*, 772 F.3d 455 (7th Cir. 2014). Under the amended FCA, liability attaches "whenever a person knowingly makes a false claim to obtain money or property, any part of which is provided by the Government without regard to whether the wrongdoer deals directly with the Federal

Government; with an agent acting on the Government's behalf, or with a third party contractor, grantee, or other recipient of such money or property." *U.S. v. McMahon*, No. 11 C 4620, 2015 WL 115763, at \*7 (N.D. Ill. Jan. 5, 2010) (citation omitted).

"To say fraud has been *pleaded* with particularity is not to say that it has been *proved* (nor is proof part of the pleading requirement)." *Lusby*, 570 F.3d at 855. A relator must "identify specific false claims for payment or specific false statements made in order to obtain payment." *U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003). For each alleged false statement, the relator must plead "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated . . . ." *See Grenadyor*, 772 F.3d at 1106 (citation omitted). However, because Plaintiffs claim Defendants' alleged fraudulent schemes lasted over many years, "[a] plaintiff who pleads a fraudulent scheme involving numerous transactions over a period of years need not plead specifics with respect to every instance of fraud, but [s]he must at least provide representative examples." *See Mason v. Medline Indus., Inc.*, 731 F.Supp.2d 730, 735 (N.D. Ill. 2010) (where the court found the complaint satisfied Rule 9(b) because the plaintiff gave "concrete examples, identifying the individuals and businesses involved, the relevant time frames, and the manner in which the bribes or kickbacks were paid").

Plaintiffs' FCA/IFCA allegations fall into five categories: (i) free and reduced-price lunch fraud; (ii) tuition fraud; (iii) fraudulent use of government facilities; (iv) fraudulent invoicing; and (v) payroll fraud.

**1. Certification of Compliance to Government As a Condition of Payment**

"[A]n FCA claim premised upon an alleged false certification of compliance with statutory or regulatory requirements [] requires that the certification of compliance be a condition of or prerequisite to government payment." *See Gross*, 415 F.3d at 604 (holding plaintiff's second amended complaint failed because it did not allege payment by the government was conditioned upon certification of regulatory compliance). A relator can infer a false statement was made, provided "the inference . . . is a plausible one" and is pleaded with the required specificity. *Lusby*, 570 F.3d at 854.

For the lunch fraud claims, Ayala attached a blank lunch form to her motion to dismiss. The form states "Application for Free Milk/Meal and Reduced-Price Meals—Complete One Application Per Household Per School District." On the bottom of the form, there is a section "School Use Only" which requires the "Signature of Determining Official," the "Signature of Confirming Official," and a space "Verifying Official's Signature." Although Plaintiffs have not yet provided the actual School Lunch Forms submitted by Defendants, at the present posture of the case, a relator does not need to produce a copy of the physical document making the

false claim. *Leveski*, 719 F.3d at 838. As long as the requisite particularity exists, the same applies for any physical forms that may have required certification before submission to the government relating to the alleged tuition fraud, fraudulent use of government facilities, fraudulent invoices and payroll fraud. Whether Plaintiffs have pleaded the falsity of the statements to the government with the requisite specificity is analyzed in sequence below.

## 2. Lunch Fraud

In addition to the allegations supplied in the Background Section, Part I, *supra*, Plaintiffs supply fifteen more pages of allegations under Count I and incorporated in Count II, to support their assertions that Santos, Howze, Troche, Alequin, Mouroukos, Feliz-Matos, Arroyo, Ramos, the Romans, Vera, Mercado, Velez, Vasquez, John Doe and Jane Doe (the "parent-Defendants") engaged in lunch fraud by intentionally submitting false information regarding their household income or family size so their children would qualify for free or reduced-price school lunches in 2007, 2008, 2009, 2010 and/or 2011. Comparably, Plaintiffs also allege that Ayala, Matos, Martin and Borges-Caraballo engaged in school lunch fraud when they instructed or assisted others in submitting false information so their children could receive free lunches. As the principal, Ayala was purportedly the recipient of state and federal funds allocated for the free or subsidized lunches and had discretion on how the funds were spent.

It is true that some Defendants worked under Ayala and did not submit School Lunch Forms for their children, but were allegedly involved in a conspiracy to submit

the forms. For instance, Plaintiffs allege Martin, a guidance counselor, knowingly submitted documents to the government to allow the waiver of college application fees for one of Santos's children in December 2009. This was done even though Plaintiffs told Martin that Santos' child was ineligible. Indeed, general civil conspiracy principles apply to FCA conspiracy claims., *U.S. ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 546 (7th Cir. 1999), but notably, Plaintiffs do not file a separate FCA conspiracy claim; their allegations of a conspiracy are embedded in Counts I and II (the alleged violations of the FCA/IFCA). For Martin's situation, whether she submitted additional documents on behalf of Santos's child and the exact information she heard from Plaintiffs about this child's ineligibility are questions of fact. There are currently enough details about Martin's purported role in the lunch fraud and the tuition fraud, Part II(C)(5), *supra*, to survive dismissal of the FCA/IFCA claims against her. The allegations against Martin with respect to Counts I and II stand.

Focusing back on the overarching allegations of lunch fraud, according to the amended complaint, Plaintiffs' interactions with the son of NGHS math teacher, Santos, began their inquiry about possible fraudulent activity occurring at NGHS. In December 2009, Santos's son allegedly told Sandstrom in the NGHS counseling office, and in the presence of Isla, that Santos "purposely lied" on federal school lunch applications in 2008, 2009 and 2010 so that he and his sister could receive free meals and have other school fees waived while they attended NGHS. At that same time, Santos's daughter told Sandstrom she had received free lunch since she started at

NGHS in 2006 because Santos intentionally misrepresented his household income on the School Lunch Forms. The form Santos submitted to NGHS in 2008 and 2009 only included his wife's monthly gross income of $1,800.00 with an annual gross income of $21,600.00 for a family of four. In 2009 and 2010, Santos misrepresented his family's annual gross income as $22,100.00 and stated he had a family of six, even though his daughter's FAFSA application indicated he only had a family size of four. Because of these misrepresentations, Santos's children were eligible to receive free breakfast and lunch and were exempt from paying Advanced Payment exam fees and college application fees. Santos and other parent-Defendants maintain that they never submitted a false statement to the government, but only to NGHS. However, it is highly plausible that when these parent-Defendants allegedly misstated their family's annual income on the "Application for Free/Milk Meal and Reduced-Price Meals" on purpose, they understood that as a public high school, government funding could have covered the meal costs. Under Rule 9(b), knowledge of the funding procedure and source of the funds is not a prerequisite. Plaintiffs only must plead that Defendants knew that the claim presented to the government for payment was false—which they have done.

For the other parent-Defendants, including Howze, Troche, Alequin, Mouroukos, Feliz-Matos, Arroyo, Ramos, the Romans, Vera, Mercado, Velez, Vasquez, John Doe and Jane Doe, Plaintiffs lodge very similar allegations against them. Velez, who has not filed an appearance in the instant lawsuit, was a Cook

County Sheriff's Office employee and is the only parent-Defendant who was never employed by the Board. These allegations about the School Lunch Forms include specifics on when each Defendant engaged in the conduct, how they misrepresented their household incomes, and for some Defendants, the exact annual income[2] they misrepresented on the forms and other additional information disclosed by the Inspector General Report. As stated before, Defendants' knowledge of the false School Lunch Forms can be asserted generally at this stage in the proceedings.

The Court needs to clarify that based on the amended complaint, there are essentially two false submissions to the government with this alleged scheme. First, Plaintiffs allege that the parent-Defendants intentionally misrepresented information and signed off on lunch forms submitted to NGHS. These parents were allegedly assisted or instructed to understate their household income or overstate the size of their family for their children to qualify for the free or subsidized lunch programs. Next, the submitted forms were allegedly signed by Ayala or her staff at her direction, and then sent to the government. Various Defendants working as Ayala's office personnel, and including Ayala, did not submit School Lunch Forms for their children, but allegedly assisted in signing or approving the School Lunch Forms sent to the government. These non-parent Defendants argue they were not involved in the submission of the School Lunch Forms whatsoever. However, at this stage of the proceeding, these arguments fail. The facts surrounding the submissions will be

---

[2] The Court does not expect Plaintiffs to know the annual income of each Defendant at this point in the lawsuit.

unveiled during the discovery process, including the roles that Ayala, Martin and Ayala's office personnel played in the alleged scheme to make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim. *See* 31 U.S.C. § 3729(a)(1)-(2). At this pleadings stage however, the Court finds Plaintiffs have provided a general outline of the lunch fraud scheme throughout their many pages of allegations that sufficiently notify Defendants of their purported roles in the lunch fraud and satisfy Rule 9(b).

### 3. False Invoices

Plaintiffs allege that as a direct and proximate result of Plaintiffs' Report about the lunch and tuition fraud at NGHS, the Inspector General Report uncovered even more information about fraud. One such scheme implicated Rafael Boghosian, the NGHS Technology Coordinator, his wife, Shirlann, Ayala and Cruz. From 2005 to 2010, the Boghosians both supposedly held themselves out to the government as "vendors" and intentionally submitted false invoices for "work" that had never been performed. The Inspector General Report found "the principal [Ayala] and school business manager [Cruz] knew of and participated in the vendor's [Boghosians'] scheme to avoid the CPS [ ] rules."

In response, Ayala and Cruz argue that a violation of administrative regulations does not rise to the level of a false claim to defraud the government. The Boghosians insist the work allegedly unperformed was actually completed by Rafael Boghosian, and the amended complaint fails to allege the Boghosians received or obtained any

funds after submitting the false invoices. In their amended complaint, Plaintiffs provide the Board's publicly available financial records from 2009 to 2010, which state 26.8% of the Board's financial resources were State of Illinois dollars and federal money constituted 21.5% of Board funds. As a public school, the Court rightfully assumes NGHS received a part of this government funding. The amount of funding is irrelevant at this time. Although the Boghosians may not deal directly with the federal government, they can still be liable under the amended version of the FCA for knowingly making a false claim to obtain government money. *See U.S. v. McMahon*, No. 11 C 4620, 2015 WL 115763, at *7 (FCA liability attaches "whenever a person knowingly makes a false claim to obtain money or property, any part of which is provided by the Government without regard to whether the wrongdoer deals directly with the Federal Government…").

To establish the falsity of the invoices under Rule 9(b), Plaintiffs supply the identities of the people who allegedly partook in the scheme. In addition, they provide the time period, 2005 to 2010, and the method by which the Boghosians would submit their misrepresentations to the government—through invoices. As for Ayala and Cruz's roles, Plaintiffs rely on the Inspector General Report, which names Ayala and Cruz as knowledgeable participants in the scheme. *See* Fed. R. Civ. P. 10(c) (it is necessary for the Court to take all facts pleaded in the amended complaint as true and construe all inferences in Plaintiffs' favor by reviewing the amended complaint and *all exhibits attached*) (emphasis added). Again, knowledge can be

averred generally under Rule 9(b). Although Cruz claims she did not have the authority to approve the invoices, the fact that she is listed as the business manager infers she had some authority to *manage* business matters, like invoices, at NGHS. Discovery will reveal whether or not that is true.

For clarification purposes, the Court does not consider the Inspector General Report as evidence at this time, but as supplementation to the amended complaint's allegations. Defendants' assertion that Plaintiffs' allegations contradict the Inspector General Report is unavailing. While the Inspector General Report states that the consulting work Shirlann received payment for was actually performed by Rafael, Plaintiffs do not allege the Boghosians were paid for work **they** never performed. Rather, Plaintiffs state that false invoices were submitted "for 'work' that had never [been] performed." *See Forrest v. Universal Sav. Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007) ("Where an exhibit and the complaint conflict, the exhibit typically controls."). Defendants' contention that Rafael Boghosian actually completed the work for his wife, Shirlann, is a factual determination that will be addressed at a later phase of this lawsuit.

Therefore, after reviewing the allegations about fraudulent invoicing in the amended complaint, and incorporating the findings outlined in the Inspector General Report, it is plausible: (i) the Boghosians submitted fraudulent invoices to recover state and federal funds for work that was never performed; and (ii) Ayala and Cruz participated in the scheme and knew the invoices were false.

## 4. Payroll Fraud

Plaintiffs allege that Lopez, Cruz and Santos's intentional misrepresentations of Lopez and Santos's payroll records amounted to a violation of the FCA and ICFA. Plaintiffs claim that during the 2008-2009 and 2009-2010 school years, Lopez's name appeared on the staff roster for NGHS as a full-time English teacher. Lopez's name was also listed on students' schedules and quarterly report cards even though Lopez, himself, was supposedly not teaching any English classes. In fact, Plaintiffs contend that the English classes in question were actually taught by Lopez's brother-in-law, Max Malagarejo ("Malagarejo"). Malagarejo was hired by Ayala to serve as an AVID tutor at NGHS. In 2008, 2009 and 2010, Lopez allegedly told Plaintiffs that instead of attending his job at NGHS on a regular basis, he was attending doctoral classes, workshops and presentations at National Louis University. In 2009, Plaintiffs became aware that Lopez, upon information and belief, was acting in collaboration with Cruz, the payroll clerk. Cruz would alter Lopez's payroll sign-in sheets and swipe records so it appeared Lopez continued to serve in a full-time capacity at NGHS. From at least September 2009 until November 2009, Plaintiffs allege Lopez was paid a full teacher's salary, listed as a teacher on school documents, and paid by Ayala as NGHS's Director of Professional Development. Lopez was paid all of this compensation even though Malagarejo allegedly taught his courses. During this same time period, Santos was also paid as a full time tutor at NGHS. The Inspector General Report supports these allegations, stating that Santos falsified attendance records by

fraudulently misrepresenting that he was performing duties on behalf of the Board, when he actually performed duties for a different position at Malcolm X College.

Cruz states Plaintiffs fail to identify whether Cruz had the authority to access payroll sign-in sheets and swipe records. Moreover, Cruz argues Plaintiffs supply contradicting allegations, that Cruz was both the payroll clerk and the business manager for the school. Santos argues Plaintiffs do not allege he had to certify any documents to the government for payment as a full time tutor at NGHS while working at Malcolm X or that he made, used, or caused another "to make or use any fraudulent record or statement for the purpose of coaxing a payment of money from the government." Lopez supports his arguments by stating the claims made on "information and belief" warrant dismissal.

The question is whether these allegations of payroll fraud arise to a representative example of a fraudulent scheme. First, Plaintiffs identify the actors in the alleged payroll fraud and the time period it occurred, including the possibility Cruz served as the business manager and the payroll clerk at NGHS. It is plausible the two positions overlap. Additionally, Plaintiffs supply information about Malagarejo actually performing the work at NGHS instead of Lopez, even though Lopez continued to be compensated while he worked elsewhere. The amended complaint also contains details about how Cruz assisted Lopez in altering his payroll sheets and how Cruz initiated the misrepresentations. Although one of Plaintiffs' allegations in this section is based on "information and belief," which generally is

32

insufficient to satisfy Rule 9(b), *Pirelli*, 631 F.3d at 442, there is an exception to this general prohibition in cases where "(1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides the grounds for his suspicions." *Id*. at 443 (citation omitted). Undeniably, the Inspector General Report revealed some of the inaccessible information Plaintiffs were not privy to as guidance counselors at NGHS, and we would not expect Plaintiffs to know details about something like the collaboration between Lopez and Cruz to alter Lopez's payroll records. This is the type of evidence Plaintiffs are unlikely to have at this pleading stage of litigation. Thus, based on the amended complaint, it is reasonable to accept the allegations that Lopez, Cruz and Santos knowingly contributed to the submission of payroll records/time sheets to receive payment from NGHS, a partially government-funded institution, for work they misrepresented as rendered.

### 5. Tuition Fraud

Plaintiffs refer to the Illinois State Board of Education (the "ISBE"), which allocates funds to each school district based in part of the respective district's population. The Illinois School Code generally requires out-of-district students to pay for their own tuition. The ISBE is not to distribute state and federal funds to a school district to cover the tuition cost for a child who seeks to attend the school, but who lives in a different district, absent special circumstances. Illinois law prohibits a parent from providing inaccurate residency information that would allow an out-of-district child to attend school tuition-free.

Plaintiffs allege that in 2009 and 2010, certain teachers and staff at NGHS, who lived outside of the City of Chicago, intentionally misrepresented their addresses on enrollment forms (the "Enrollment Forms"). Further, Ayala and her administrators, Matos, Cruz, Ramos, and Martin, a counselor, allegedly worked together with certain parents to also intentionally misrepresent students' residency on the Enrollment Forms so their parents could avoid paying out-of-district tuition fees.

According to the amended complaint, since at least 2001, Alequin lived in Melrose Park, Illinois. In 2006, Alequin worked for NGHS as a special education classroom assistant. In 2006, Ayala allegedly encouraged Alequin to enroll her child at NGHS, even though she lived out-of-district and told Alequin she would waive the fees. Ayala then instructed Cruz to process the Enrollment Form for Alequin's daughter and waive the fee. Cruz told Alequin to intentionally misrepresent that her child lived in Chicago on the Enrollment Forms. Following Cruz's instructions, Plaintiffs claim Alequin intentionally misrepresented that she lived in Chicago to avoid paying out-of-district tuition. In 2009 and 2010, Feliz-Matos, another NGHS employee, supposedly lived in Oak Park, Illinois while her sister, Reysa Feliz, resided in Chicago. During this time period, Feliz-Matos enrolled her child at NGHS by intentionally misrepresenting on the Enrollment Form that her sister was her child's legal guardian in order to avoid paying out-of-district tuition. Vera, an employee of the Board, engaged in similar activity. She resided in Oak Park, Illinois and intentionally misrepresented her children's residency and never paid out-of-district

tuition. As for Alequin and Vera, individually, both have failed to respond to the allegations against them.

Ayala, Matos, Cruz and Martin allegedly engaged in this fraudulent tuition fraud conduct by: (i) reviewing and/or signing off on the falsified Enrollment Forms; (ii) knowing that these students lived out-of-district; (iii) understanding that Alequin and Feliz-Matos intentionally misrepresented where their children lived on the Enrollment Forms; (iv) condoning such behavior; and (v) assisting Alequin and Feliz-Matos with such fraudulent behavior. These allegations are sufficient to satisfy the heightened pleading standard because they provide for a representative illustration of the alleged fraud scheme involving Ayala and her staff.

Feliz-Matos contends Plaintiffs have not alleged she had submitted a certified claim for payment to the federal or state government, or that such forms were a requirement for payment[3]. It is evident Plaintiffs have adequately supplied the first paragraph of a newspaper story: Feliz-Matos, an employee at NGHS, lived in Oak Park, Illinois, but misrepresented her child's address on the Enrollment Form to indicate that her sister, a Chicago resident, was the legal guardian of her child, in order to avoid paying out-of-district tuition. With respect to Feliz-Matos's argument that no allegations exist stating the Enrollment Forms were a requirement for payment of money by the government to NGHS, Plaintiffs provide citations to the Illinois School Code and ISBE policy as support. What Feliz-Matos fails to acknowledge is

---

[3] We have previously addressed Feliz-Matos' inquiry about certification of the claim in Part II(C)(1), *supra*.

the absence of payment to the government for her out-of-district child resulted from the false information she submitted to NGHS. By not paying tuition, Feliz-Matos's child reaped benefits from a school without the ISBE factoring that child in its distribution of state and federal funds for students who rightfully lived in that district. The same applies for the accusations lodged against Alequin and Vera. Defendants involved with this alleged tuition fraud scheme are, therefore, not dismissed.

### 6. Fraudulent Use of Government Facilities

From 2005-2010, Caraballo and Borges-Caraballo (the "Caraballos"), in addition to being NGHS employees, also allegedly worked as "Sport Ministers" of the New Life Covenant Church. During this time, the Caraballos frequently used NGHS's gymnasium and athletic facilities for the exclusive activities of their Sports Ministry without the inclusion of other students and staff at NGHS. According to the Board's rules, a contract is appropriate for the private use of school or government facilities. Plaintiffs contend that the Caraballos never rented the facilities for their religious endeavors. Plaintiffs claim Ayala knew of and approved of this misappropriation of school facilities, but worked with the Caraballos to conceal their misconduct. All of this was reported in the Inspector General Report. The Court holds that Plaintiffs have pleaded sufficient detail as to the actors involved, the alleged fraudulent conduct, the location, and the time period to show it is plausible fraudulent use of government facilities occurred at NGHS.

As a public school receiving government funding, these representative examples of the alleged schemes identify the persons involved, the times, the locations, the content of the misrepresentations, and the methods in which the schemes were executed. Plaintiffs plead these allegations with some indicia of reliability because their beliefs that Defendants were submitting fraudulent claims for payment by the government developed from their positions as guidance counselors at NGHS. Therefore, under both versions of the FCA and the IFCA, the allegations and supporting exhibits Plaintiffs provide in Counts I and II of their amended complaint do not warrant dismissal at this time.

## III. Employment-Based Claims

### A. Retaliation under the FCA and the IFCA

Only Ayala moves for the Court to dismiss the retaliation claims under the FCA and the IFCA, in Counts III and IV, for reasons besides failure to timely serve claims—addressed in the Court's corresponding order. For FCA/IFCA retaliation claims, Plaintiffs must show that: (i) they were acting in furtherance of an FCA enforcement action or other efforts to stop violations of the FCA; (ii) Defendants knew Plaintiffs were engaged in such protected conduct; and (iii) Defendants were motivated to take an adverse employment action against Plaintiffs because of the protected conduct. 31 U.S.C. § 3730(h); *U.S. ex rel. Batty v. AmeriGroup Ill., Inc.*, 528 F.Supp.2d 861, 877 (N.D. Ill. 2007). "A § 3730(h) retaliatory discharge claim can still proceed even if neither governmental action is taken nor any qui tam action is

contemplated, threatened, filed or ultimately successful." *Luckey v. Baxter Healthcare Corp.*, 2 F.Supp.2d 1034, 1050 (N.D. Ill. 1998); *aff'd*, 183 F.3d 730 (7th Cir. 1999).

Ayala argues that Plaintiffs' FCA/IFCA retaliation claims should be dismissed because Plaintiffs cannot show that Ayala had any knowledge that Plaintiffs were acting in furtherance of an FCA enforcement action or made other efforts to stop violations of the FCA/IFCA. Ayala asserts that Plaintiffs merely allege that they tried to meet with Ayala about "false and fraudulent activity," but she refused to meet with them. Ayala also claims that Plaintiffs only offer the conclusory allegation that Ayala "knew or believed" Plaintiffs reported unidentified fraudulent activities to the governmental authority and to media outlets. Ayala states that the only allegation that Plaintiffs offer in attempt to connect Ayala to their allegations is that based on "information and belief," Borges-Caraballo spoke with Ayala about Plaintiffs' complaints of school lunch fraud and conspired with her to "ignore, conceal and/or perpetuate" the alleged fraud. Ayala insists that this is insufficient as a matter of law under the FCA/IFCA without some first-hand knowledge corroborating the allegation.

Plaintiffs argue that Ayala retaliated against them in multiple ways because of the complaints about fraud they were making about her. To establish Ayala's knowledge of Plaintiffs' whistleblowing activity, Plaintiffs make general assertions that Ayala knew of Plaintiffs' multiple complaints. Plaintiffs allege that they voiced multiple internal complaints to Ayala either directly or through her administrative

personnel regarding the fraudulent activity. Plaintiffs support these more general allegations with information stating that Sandstrom tried meeting with Ayala to report the discovery of the lunch form fraud, but she refused when she found out the reason for the meeting. Instead of meeting with Plaintiffs, Ayala allegedly directed her staff and Borges-Caraballo, the assistant principal, to harass and intimate Plaintiffs to prevent them from raising complaints. Ayala also told Isla that she would be "the next to go" if Isla complained again. In December 2009, Plaintiffs reported ongoing fraudulent activity at NGHS to the Board's law department and when Sandstrom took maternity leave, she reported the fraudulent lunches to the Inspector General and CBS Channel 2 News in Chicago. At that point, the whistle had been blown.

It is clear that the allegations plausibly create the possibility that Ayala knew Plaintiffs were conferring with one another, discussing the fraudulent conduct, and relaying the information to the appropriate authorities. Ayala's alleged refusal to meet with Plaintiffs when they desired to discuss information they had about the lunch fraud coincides with Ayala's alleged threats to Isla that she would be terminated if she continued to disclose the fraudulent activity occurring at NGHS. Ayala's motivation to take adverse employment action against Plaintiffs because of their disclosures about the events occurring at NGHS is allegedly, based on her own self-interest.

Consequently, Plaintiffs are correct that the amended complaint contains sufficient factual allegations that state a plausible claim for retaliation for reporting under the FCA and ICFA. Ayala's actual knowledge will be subject to determination

at a later time, but Plaintiffs have currently pleaded enough facts to show Ayala knew

of Plaintiffs' investigation and subsequent reporting of the fraudulent activity

occurring at NGHS. Counts III and IV against Ayala survive dismissal. As for the

Board, it does not ask the Court to dismiss Counts III and IV, and at this time, these

claims against it will also remain.

## B. Ayala's Capacity

Ayala requests that the Court dismiss Counts V, VI, VII and X against her

because Plaintiffs fail to specify the capacity in which they are suing her. There is a

significant distinction between a suit brought against a defendant in her individual

capacity and one brought against her in her official capacity. *Hill v. Shelander*, 924

F.2d 1370, 1372 (7th Cir. 1991). A lawsuit against an individual in her official

capacity "generally represent[s] only another way of pleading an action against an

entity of which the officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165

(1985). "An official-capacity suit is not a suit against the official as an individual; the

real party in interest is the entity. Therefore, a plaintiff looking to recover on a

damages judgment in an official-capacity suit can look only to the entity itself, not to

the official." *Wilson v. Civil Town of Clayton, Ind.*, 839 F.2d 375, 382 (7th Cir.

1988). On the other hand, individual capacity claims "seek to impose individual

liability upon a government officer for actions taken under color of state law." *Hafer

v. Melo*, 502 U.S. 21, 25 (1991) (citations omitted).

Plaintiffs' amended complaint does not specifically identify the capacity in which they are suing Ayala. Plaintiffs identify Ayala as the [former] principal and Plaintiffs' supervisor and that "at all times Ayala acted under the color of law." Plaintiffs also allege that at all relevant times, the Board vested decisional authority in principals, like Ayala, to make renewal and classification decisions as to guidance counselors. Ayala argues that these allegations support the assumption of an official capacity designation. Plaintiffs insist that they have pleaded their lawsuit against Ayala in her individual and official capacities because the Court can infer that Ayala is being sued in her individual capacity, and cite *Langford v. Cnty. of Cook*, 965 F.Supp. 1091 (N.D. Ill. 1997). Plaintiffs refer the Court to their prayer for relief, which requests punitive damages against Ayala only for Counts VII-IX and XII. Ayala claims that the prayer for relief's limited reference to certain counts only includes two of Sandstrom's three FMLA counts against Ayala and the retaliatory discharge count, which is asserted against the Board only. More importantly, Ayala states that the prayer for relief which the Plaintiffs reference does not include Counts V and VI, in which Sandstrom asserts her Section 1983 claims.

In *Hill*, the Seventh Circuit stated that it would not presume that a defendant was being sued in his official capacity every time that the complaint failed to clearly indicate which capacity a defendant was being sued. *Hill*, 924 F.2d at 1372. Instead, the Seventh Circuit stated that in cases where the capacity of the defendant is not specified, it would look at the substance and nature of the claim alleged:

Where the plaintiff seeks injunctive relief from official policies or customs, the defendant has been sued in her official capacity; where the plaintiff alleged tortious conduct of an individual acting under color of state law, the defendant has been sued in her individual capacity.

*Miller v. Smith*, 220 F.3d 491, 494 (7th Cir. 2000) (citing *Hill*, 924 F.2d at 1373-74).

In the instant matter, looking at the substance of the amended complaint "in its entirety," the Court can presently infer that Plaintiffs intended to raise claims against Ayala in her official *and* individual capacities. For instance, Plaintiffs allege Counts V, VI, VII and X against Ayala and the Board. They do not specify that the claims are against Ayala in her individual capacity, but they specifically separate Ayala and the Board in the respective headings of each claim. Plaintiffs also allege that Ayala was acting "under the color of law" in Count X. Plaintiffs' arguments are supported by their response, where they insist that they are suing Ayala in both capacities. The Court refuses to dispose of Counts V, VI, VII and X based on confusion as to what capacity Plaintiffs are suing Ayala. Therefore, we find that Plaintiffs have pleaded Counts V, VI, VII, and X against Ayala in her official and individual capacities.

In addition, Ayala moves to dismiss Counts V, VI, and VII alleged against her in her official capacity. Her argument is based on the fact that the Court must treat the official capacity claims against Ayala as claims against the Board, making such claims redundant since Sandstrom also alleges these claims against the Board. Since official capacity claims against individuals employed by the Board are essentially claims against the Board, *Moore v. Bd. of Educ. of City of Chicago*, 300 F.Supp.2d

641, 646 (N.D. Ill. 2004), and the Court has concluded that Sandstrom has properly alleged civil rights violations against the Board, Part III(C), *infra*, we dismiss Counts V, VI, and VII against Ayala in her official capacity as redundant. The sufficiency of Counts V, VI and VII against the Board and Ayala, in her individual capacity, is discussed below.

### C. Claims Against the Board

The Board asks the Court to dismiss Counts V, VI, VII and X because of Sandstrom's failure to plead the requisite facts for *Monell* liability pursuant *Monell v. Dep't of Soc Servs. of City of New York*, 436 U.S. 658 (1978). The doctrine of respondeat superior is unavailable under Section 1983 so Sandstrom must present evidence that the Board itself violated her civil rights. *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009). To support *Monell* liability, Sandstrom must plead the violation of her Section 1981 or 1983 rights "was caused by a custom or policy within the meaning of *Monell* and subsequent cases." *Thompson v. Bd. of Educ. of City of Chi.*, No. 11 C 1712, 2014 WL 1322958, at *4 (N.D. Ill. Apr. 2, 2014) (citation omitted). A "policy," is an express policy, a widespread and permanent practice, or action by a person with final policymaking authority. *McCormick v. City of Chi.*, 230 F.3d 319, 324 (7th Cir. 2000). Whether a particular official has final policymaking authority is a question of state law. *Wragg v. Vill. of Thorton*, 604 F.3d 464, 468 (7th Cir. 2010). Illinois law states: "The right to employ, discharge, and layoff shall be vested solely with the board, provided that decisions to

discharge or suspend non-certified employees, including disciplinary layoffs, and the termination of certified employees from employment pursuant to a layoff or reassignment policy are subject to review under the grievance resolution procedure." 105 ILCS 5/34-8.1.

To maintain her Section 1983 claims, Sandstrom must demonstrate that the Board either delegated final policymaking authority to Ayala or ratified Ayala's action. *Darchak*, 580 F.3d at 630. Under the delegation theory, the person or entity with final policymaking authority must delegate the power to make policy, not simply the power to make decisions. "There must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire." *Kujawski v. Bd of Comm'rs of Bartholomew Cnty., Ind.*, 183 F.3d 734, 739 (7th Cir. 1999) (citations omitted).

The Board claims that Sandstrom does not allege that the Board had an express policy or widespread practice of discriminating against Caucasian-Americans, pregnant women or persons exercising their FMLA rights. The Board also asserts that Sandstrom's allegation that Ayala "was a final policymaker" is conclusory. In the amended complaint, Sandstrom alleges that Ayala was a final-decision maker and a final policy-maker as to employment and staffing matters at NGHS. Sandstrom also claims in Count V that "Ayala, as a final policymaker, intentionally discriminated against Sandstrom based on her race and national origin by giving more favorable treatment (promotion and retention) to Hispanic employees." Sandstrom alleges

generally that at all relevant times, the Board had "invariable custom and usage of vesting decisional authority in principals," like Ayala, to make renewal and classification decisions as to guidance counselors. The Board supposedly had a policy and practice by which it delegated and entirely deferred to Ayala for all employment and personnel decisions at NGHS, including hiring, reassignments and terminations.

At this time, the Court finds that Sandstrom's collective allegations are enough to show that it is plausible that the Board abdicated its authority, including delegating Ayala with the authority to set *policy* at NGHS for hiring and firing, unreviewable by the Board. It is also possible that it was Ayala's final decision to terminate (or not renew) a guidance counselor position. The extent of the Board's abdication of final policymaking to Ayala will be revealed during discovery. Therefore, we presently deny the Board's motion to dismiss civil rights claims against it under Sections 1981 and 1983, based on a lack of *Monell*-based liability. The Board does not ask for dismissal of Counts VIII, IX, XI, and XII, and those claims will also stand.

### D. Remaining Sections 1981 and 1983 Claims

As for Sandstrom's Section 1981 claim against Defendants in Count VII for both racial discrimination and discrimination based on national origin, Defendants move to dismiss the "national origin" element of the count. Section 1981 prevents only race discrimination. *Perez v. Norwegian–American Hosp., Inc.*, 93 Fed.Appx. 910, 913 n. 1 (7th Cir. 2004). The Court notes that "race" is defined broadly in Section 1981 actions to include national origin, so to the extent that Count VII argues

any discrimination was based on national origin, the Court will consider those arguments as one of racial discrimination under Count VII. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756–757 (7th Cir. 2006). The racial discrimination component of Count VII against the Board and Ayala, in her individual capacity, is not dismissed.

With respect to Count V, the parties agree that Sandstrom is relying on the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution to assert this Section 1983 claim. Section 1983 provides a private right of action to remedy violations of constitutional and federal statutory rights committed under color of law. 42 U.S.C. § 1983. The Supreme Court has held that "[w]hen the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 2010 (1981). Since "a plaintiff may sue her state government employer for violations of the Fourteenth Amendment through Section 1983 and escape Title VII's comprehensive remedial scheme, even if the same facts would suggest a violation of Title VII," Count V against the Board and Ayala, in her individual capacity, stands. *See Levin v. Madigan*, 692 F.3d 607, 617 (7th Cir. 2012) (internal citation omitted).

Sandstrom bases her remaining two Section 1983 violations on the PDA (Count VI) and the FMLA (Count X). Defendants aver that Counts VI and X should be dismissed because Sandstrom does not allege any constitutional violation, but expressly relies on the statutory provisions of the PDA and FMLA. Defendants claim

that both statutes provide comprehensive remedial schemes, which should not be bypassed under the guise of a Section 1983 claim.

In Count VI, an action for a Section 1983 violation of the PDA, Sandstrom alleges that Ayala began treating Sandstrom in a hostile and threatening manner, including becoming overly critical of Sandstrom's performance and for eating at her desk, a task which allegedly became necessary due to her pregnancy. When Sandstrom went to the hospital after experiencing contractions, Ayala allegedly criticized her for not calling the school to inform them that she would be missing work. Subsequently, when Sandstrom returned, Ayala criticized her for not having completed work due "by the end of the day," even though she was in the hospital the week prior. While Sandstrom took maternity leave, she alleges that Ayala intentionally discriminated against her and terminated Sandstrom because of her pregnancy status, giving preferential treatment (retention) to non-pregnant employees. As a result of Ayala's actions, and the Board's delegation of such alleged final policy-making decisions to Ayala, Sandstrom allegedly suffered embarrassment, humiliation, emotional distress, and other forms of damages, including continuing injuries.

For the first time in years, the Supreme Court issued an opinion on March 25, 2015 regarding the scope of the PDA. *See Young v. United Parcel Serv., Inc.*, 135 S.Ct. 1338 (2015). Although the Supreme Court did not mention Section 1983 actions brought under a violation of the PDA, for the sake of fairness, the Court will allow the parties to address any implications *Young*'s statutory interpretation of the PDA has on

the underlying PDA violation, including information about the PDA's remedial scheme, in a concise, five-page submission to the Court.[4]

Count X, a Section 1983 violation of the FMLA, is alleged against the Board and Ayala. It is true that the "Seventh Circuit has [still] yet to rule on whether the enforcement mechanisms in the [] FMLA [is] sufficiently comprehensive as to preclude enforcement of the statutes through Section 1983." *McGee v. City of Chicago*, No. 11 C 2512, 2011 WL 4382484, at *3 (N.D. Ill. 2011)[5]. The court in *McGee* found that the FMLA enforcement mechanism is modeled on the FLSA and that nothing in the language of the FMLA statute fails to provide for comprehensive enforcement of the rights it creates. *Id*. at *3-4. Although district courts are split on the issue with regard to the FMLA, the Court finds no compelling reason to divert from the sound reasoning explained by the court in *McGee*:

> "[D]espite the fact that there is no administrative component to FMLA enforcement, there is still potential for conflict between Section 1983 enforcement and the enforcement mechanism of the FMLA. The FMLA provides for private rights of action, as well as for action by the Secretary of Labor. 29 U.S.C. §§ 2617(a)(2), (b), & (d). In the event that the Secretary pursues a claim, the private litigant may no longer pursue an individual claim. 29 U.S.C. § 2617(a)(4). Allowing a litigant to circumvent this procedure by filing a Section 1983 claim simultaneously would frustrate the scheme Congress provided."

*Id*. at *4. Thus, "where a federal statute provides its own comprehensive enforcement scheme, that scheme may not ordinarily be bypassed by pleading an underlying

---

[4] This analysis also applies to Count VI against the Board.
[5] Both attorneys for Ayala and Sandstrom should be familiar with the ruling in *McGee* since they are listed as the counsels of record for that case.

violation of the statute and bringing suit directly under section 1983." *Alexander v. Chicago Park Dist.*, 773 F.2d 850, 856 (7th Cir. 1985).  The Court hereby grants Defendants' motion to dismiss Count X in its entirety.

### E. Sandstrom's FMLA Claims

As for Sandstrom's FMLA claims, she alleges that she worked more than 1250 hours for Defendants in the twelve-month period prior to requesting FMLA leave, and before taking leave for the birth of her child.  At all relevant times, Ayala was allegedly Sandstrom's employer under the FMLA, as she acted in the direct interest of CPS and the Board relative to Sandstrom.

On December 16, 2009, Sandstrom provided Ayala with a copy of a notice from her obstetrician that confirmed Sandstrom had a high-risk pregnancy and would require intermittent periods of rest.  The doctor's note requested that NGHS provide Sandstrom with the intermittent leave that she required for her high-risk pregnancy. Sandstrom alleges that Ayala knew that she was in need of FMLA leave due to her high-risk pregnancy and related complications, considered a serious medical condition under the FMLA.  Ayala allegedly ignored Sandstrom's note and took no action to investigate if Sandstrom required intermittent FMLA leave.  However, Sandstrom was allowed to take FMLA leave when she gave birth and during the recovery time thereafter.

Throughout January and February of 2010, Sandstrom allegedly followed up with Ayala regarding her doctor's note and her requests for intermittent leave due to

her high-risk pregnancy.  Ayala continued to ignore Sandstrom's requests for leave, denying her right to intermittent FMLA leave.  Sandstrom then took maternity leave. After Sandstrom initially requested intermittent leave in December of 2009, she claims that Ayala began confronting and criticizing her.  Ayala became hostile and threatening towards Sandstrom, including becoming overly critical of Sandstrom's performance and for eating at her desk.

On March 8, 2010, Sandstrom began to feel contractions and two colleagues drove her to the hospital during the school day.  Sandstrom was held at the hospital for observation until March 12, 2010.  On March 15, 2010, Ayala allegedly criticized Sandstrom for not calling the school to inform them that she would be missing work. However, Sandstrom contends that her sister had called in and informed other faculty members in her office that Sandstrom was being held at the hospital.  Ayala then criticized Sandstrom for not having yet completed certain work activities, which were to be due at the end of the day on March 15, 2010, even though she had been at the hospital most of the previous week.

### 1. Violation of the FMLA (Discrimination/Retaliation)

Sandstrom alleges that Ayala denied her intermittent FMLA leave for months prior to her giving birth.  Ayala further discriminated against Sandstrom and allegedly violated the FMLA when Sandstrom was on leave by reassigning her to a different position, which Ayala had planned to eliminate as part of a "budget-cutting process." Sandstrom claims that Ayala willfully and intentionally discriminated and/or

retaliated against Sandstrom and selected Sandstrom for termination because Sandstrom sought and took FMLA leave.

The Board does not request dismissal of Count VIII and Ayala only asks for the Court to dismiss Count VIII based on delay of service, which the Court addressed in its corresponding order. Thus, we will not dismiss Count VIII against the Board or Ayala.

### 2. Violation of the FMLA (Interference)

In addition to allegedly subjecting Sandstrom to discriminatory treatment, she alleges that Ayala interfered with her right to FMLA leave. Ayala's actions, described above, were allegedly an attempt to discourage Sandstrom from exercising her rights under the FMLA, and interfered with, and discouraged, Sandstrom from being able to take FMLA leave. Sandstrom contends that Ayala's actions constituted an intentional and willful interference with and denial of her rights to take her statutorily protected FMLA leave intermittently.

The FMLA entitles an eligible employee to 12 weeks of unpaid leave during a 12-month period in order to care for a spouse, child, or parent with a serious health condition. 29 U.S.C. § 2612(a)(1)(C). The FMLA further provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter. 29 U.S.C. § 2612(a)(1). To prevail on a claim for FMLA interference, a plaintiff is required to prove that: (i) she was eligible for the FMLA's protections; (ii) Ayala is an employer as defined by

the FMLA; (iii) she was entitled to leave under the FMLA; (iv) she provided

sufficient notice of her intent to take leave; and (v) she was denied FMLA benefits to

which she was entitled. *Scruggs v. Carrier Corp.*, 688 F.3d 821, 825 (7th Cir. 2012).

"Interfering with" the exercise of any employee's rights includes refusing to authorize

FMLA leave and discouraging an employee for using such leave. 29 U.S.C. §

825.220(b). As with any claim for FMLA interference, Sandstrom is only entitled to

relief is she was prejudiced by the alleged violation. *Ragsdale v. Wolverine World

Wide, Inc.*, 535 U.S. 81, 89 (2002) ("[A]n employee must prove, as a threshold matter,

that the employer violated [29 U.S.C.] § 2615 by interfering with, restraining, or

denying his or her exercise of FMLA rights. Even then, § 2617 provides no relief

unless the employees has been prejudiced by the violation.").

 Ayala argues that Sandstrom's FMLA interference claim should be dismissed

because Sandstrom fails to plead that she actually requested a particular intermittent

leave, such leave was denied, and that she suffered real consequences. Ayala also

claims that nothing in the amended complaint indicates that Sandstrom actually

needed to take time off or was denied the ability to do so. Sandstrom also asserts

Count IX against the Board, which does not request dismissal of this claim.

 The Court finds that Sandstrom's allegation that she "submitted a request to

Ayala by personally submitting a doctor's note which included such a request" is

enough to satisfy that she provided sufficient notice of her intent to take leave. We

can infer that Sandstrom requested FMLA leave when submitting her doctor's note,

which will be produced during discovery.  Once the letter is in evidence, the Court

will be allowed to assess if Sandstrom truly intended to take leave or whether her

doctors advised her that leave was a possibility.  However, at the present posture, the

allegations about the doctor's note are sufficient.  Additionally, Sandstrom has

properly pleaded that she was denied FMLA leave and that she was harmed by

Ayala's interference of her FMLA leave.  The distress Ayala experienced with her

high risk pregnancy and Ayala's harassing conduct discouraged Sandstrom from

going to the hospital again or using FMLA leave prior to giving birth.   Accordingly,

Count IX against Ayala and the Board remains.

## CONCLUSION

In sum, Counts I and II remain against Ayala, Matos, Martin, Santos, Howze,

Troche, Alequin, Mouroukos, Feliz-Matos, Arroyo, Ramos, Ida Roman, Leo Roman,

Vera, Mercado, Velez, Vasquez, Borges-Caraballo, Caraballo, Cruz, Lopez, Rafeal

Boghosian, Shirlann Boghosian, John Doe and Jane Doe.  Counts III, IV, V, VIII and

IX, XI and XII remain against the Board.  Counts III, IV, VIII, IX remain against

Ayala.  Counts V, VI, and VII are dismissed against Ayala, in her official capacity.

Count V remains against Ayala, in her individual capacity.  Count VII against the

Board and Ayala, in her individual capacity, remains as to the racial discrimination

component only.  Defendants' motion to dismiss Count VI against the Board and

Ayala, in her individual capacity, is entered and continued pending the five-page

submissions of the parties in light of the recent Supreme Court case, *Young v. United*

*Parcel Serv., Inc.*, 135 S.Ct. 1338 (2015). Parties' submissions are due seven days from the entry of this opinion. Count X is dismissed against the Board and Ayala, in both of her capacities. It is so ordered.


Charles P. Kocoras
United States District Judge

Dated: 4/27/2015